United States Court of Appeals
Fifth Circuit

**F I L E D**

March 19, 2007

Charles R. Fulbruge III
Clerk

In the
# United States Court of Appeals
## for the Fifth Circuit

—————————

m 06-20856

—————————

REGENTS OF THE UNIVERSITY OF CALIFORNIA;
WASHINGTON STATE INVESTMENT BOARD;
SAN FRANCISCO CITY AND COUNTY EMPLOYEES' RETIREMENT SYSTEM;
EMPLOYER-TEAMSTERS LOCAL NUMBERS 175 AND 505 PENSION TRUST FUND;
HAWAII LABORERS PENSION PLAN; STARO ASSET MANAGEMENT LLC;
AMALGAMATED BANK,
AS TRUSTEE FOR THE LONGVIEW COLLECTIVE INVESTMENT FUND;
ROBERT V. FLINT; JOHN ZEGARSKI; MERVIN SCHWARTZ, JR.;
STEVEN SMITH; ARCHDIOCESE OF MILWAUKEE;
GREENVILLE PLUMBERS PENSION PLAN;
NATHANIEL PULSIFER,
AS TRUSTEE OF THE SHOOTERS HILL REVOCABLE TRUST,

Plaintiffs-Appellees,

VERSUS

CREDIT SUISSE FIRST BOSTON (USA), INC.;
CREDIT SUISSE FIRST BOSTON LLC; PERSHING LLC;
MERRILL LYNCH & COMPANY, INC.;
MERRILL LYNCH PIERCE FENNER & SMITH, INC.;

Defendants-Appellants,

BARCLAYS PLC; BARCLAYS BANK PLC; BARCLAYS CAPITAL, INC.,

Appellants.

Appeals from the United States District Court
for the Southern District of Texas
m H-01-3624

Before JOLLY, SMITH, and DENNIS,
  Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Having been granted leave to pursue an interlocutory appeal, *see* FED. R. CIV. P. 23(f), defendants challenge an order certifying a single class of plaintiffs. Relying largely on *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), and its progeny, we reverse and remand.

I.

The facts are difficult to detail but easy to summarize. Plaintiffs allege that defendants Credit Suisse First Boston ("Credit Suisse"), Merrill Lynch & Company, Inc. ("Merrill Lynch"), and Barclays Bank PLC ("Barclays Bank") (collectively "the banks") entered into partnerships and transactions that allowed Enron Corporation ("Enron") to take liabilities off of its books temporarily and to book revenue from the transactions when it was actually incurring debt. The common feature of these transactions is that they allowed *Enron* to misstate its financial condition; there is no allegation that the banks were fiduciaries of the plaintiffs, that they improperly filed financial reports on Enron's behalf, or that they engaged in wash sales or other manipulative activities directly in the market for Enron securities.

For example, plaintiffs allege that Merrill Lynch engaged in what they dub the "Nigerian Barges Transaction." According to plaintiffs, Enron wanted to "sell" its interest in electricity-generating barges off the coast of Nigeria by the end of 1999 so that it could book revenue and meet stock analysts' estimates for the calendar quarter. It could find no legitimate buyer, so it contacted Merrill Lynch and guaranteed that it would buy the barges back within six months at a premium for Merrill Lynch.

Six months later, Enron made good on its guarantee; an Enron-controlled partnership bought the barges from Merrill Lynch at a premium. When Enron reported its results for 1999, instead of booking the transaction as a loan, the characterization that Enron's outside accountants state would have been appropriate had they known of the side-agreement to buy back the barges, Enron booked the transaction as a sale and accordingly listed the revenue therefrom in its year-end financial statement.

Plaintiffs allege that the banks knew exactly why Enron was engaging in seemingly irrational transactions such as this. They cite certain of the banks' internal communications they characterize as proving that the banks were aware of the personal compensation Enron executives received as a result of inflating their stock price through the illusion of revenue and that the banks intended to profit by helping the executives maintain that illusion.[1]

---

[1] Plaintiffs quote from an e-mail between Mer-
(continued...)

2

Likewise, plaintiffs allege that, although each defendant may not have been aware of exactly how each other defendant was helping Enron to misrepresent its financial health, the defendants knew in general that other defendants were doing so and that Enron was engaged in a long-term scheme to defraud investors and maximize executive compensation by inflating revenue and disguising risk and liabilities through its partnerships and transactions with the banks.

## II.

This suit followed Enron's collapse in 2001. The first action was filed on October 22 of that year; by December 12, 2001, the district court had consolidated over thirty actions relating to Enron securities and had designated the Regents of the University of California as the lead plaintiff. Years of discovery have ensued, and tens of millions of documents have been produced.

Early in the litigation, the banks filed motions to dismiss, but the district court denied them in a December 19, 2002, opinion. The court reconsidered some of the issues relevant to those motions in its opinion regarding class certification, issued on June 5, 2006,[2] in light of intervening developments in appellate case-law. The court justified its reconsideration, stating that it had

> the power to reconsider such interlocutory decisions, especially in light of the limited and much of it recent case law emerging on scheme liability. Moreover . . . at class certification, especially after such substantial discovery as has been done here, the court may look behind the pleadings at evidence to determine whether a class should be certified.

The court determined that a "deceptive act" within the meaning of rule 10b-5(c)[3] includes participating in a "transaction whose principal purpose and effect is to create a false appearance of revenues."

The district court decided that rule 10b-5(a)'s prohibition of any "scheme . . . to defraud" gives rise to joint and several liability for defendants who commit individual acts of deception in furtherance of such a scheme. Implicit in that ruling is the conclusion that plaintiffs have alleged that just such a scheme existed.

The court's theory of scheme liability considerably simplified finding commonality among the plaintiffs with respect to loss causation. The court stated that "a reasonable argument can be made that where a defendant

---

[1](...continued)
rill Lynch employees "[A]t year-end (sic) when we did this trade (the Nigerian barge transaction) . . . Enron knew what were making at . . . the quarter and year (which had great value in their stock price, not to mention personal compensation)." Communications between Credit Suisse employees allegedly reveal similar scienter ("Osprey is a vehicle enabling Enron to raise disguised debt which appears as equity on Enron's balance sheet . . . .").

[2] *See Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 2006 U.S. Dist.
(continued...)

---

[2](...continued)
LEXIS 43146 (S.D. Tex. 2006).

[3] We follow securities law convention and refer to the relevant statute and rule as § 10(b) and rule 10b-5 rather than as, respectively, 15 U.S.C. § 78j-10(b) and 17 C.F.R. § 240.10b-5. Section 10(b) refers to § 10(b) of the Securities Exchange Act of 1934.

3

knowingly engaged in a primary violation of the federal securities laws that was in furtherance of a larger scheme, it should be jointly and severally liable for the loss caused by the entire overarching scheme, including conduct of other scheme participants about which it knew nothing."

The district court concluded that plaintiffs are entitled to rely on the classwide presumptions of reliance for omissions and fraud on the market.[4] The court held that the *Affiliated Ute* presumption applies because the facts indicate that the banks had failed in their "duty not to engage in a fraudulent 'scheme.'" The court concluded, with respect to the fraud-on-the-market presumption of reliance, that no preliminary finding of market efficiency or investors' reliance thereon need be made where plaintiffs plead under rule 10b-5(a) (forbidding deceptive devices, schemes, and artifices) and 10b-5(c) (prohibiting deceptive acts, practices, and courses of business) rather than under the more usual cause of action, rule 10b-5(b) (proscribing misrepresentation).

A month after issuing its opinion on class certification, the district court, after reviewing plaintiffs' revised class definition and trial plan, issued its class certification order, dated July 5, 2006. It determined that, although the proportionate liability provisions of the Private Securities Litigation Reform Act ("PSLRA") are generally problematic, there is no necessary conflict between the court's theory of liability and that statute. *See* 15 U.S.C. § 78u-4(b)(4), (f)(2). The court ordered defendants to pre-

pare a list of non-parties to whom they intend to assign responsibility and declared that defendants will bear the burden to prove non-parties' responsibility by a preponderance of the evidence.

The district court certified a class of all persons who purchased Enron securities between October 19, 1998, and November 27, 2001, and were injured thereby. The class seeks damages of $40 billion, against which losing defendants would be entitled to offset roughly $7 billion obtained by plaintiffs in previous settlements with former co-defendants. On November 1, 2006, a motions panel of this court granted defendants leave to appeal the class certification order, and we *sua sponte* expedited the appeal.

III.

Plaintiffs point out that we are not bound by the motion panel's decision to grant leave to appeal; they urge that leave to appeal was improvidently granted.[5] We disagree.

This is a legally and practically significant class certification decision, and the motions panel properly allowed the appeal. The commentary to rule 23(f) indicates that it is appropriate to grant leave to appeal an adverse determination where (1) a "certification decision turns on a novel or unsettled question of law" or (2) "[a]n order granting certification . . . may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability." FED. R. CIV. P. 23(f) advisory committee note.

---

[4] *See Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) (presumptive reliance for improper omissions); *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (adopting fraud-on-the-market theory of reliance under certain conditions).

[5] *See United States v. Bear Marine Serv.*, 696 F.2d 1117, 1120 n.6 (5th Cir. 1983) (stating that a merits panel is not bound by a motion panel's discretionary grant of right to interlocutory appeal).

Plaintiffs contend that, even if we are entitled to address defendants' merits-based arguments, those arguments are sufficiently intertwined with the facts to counsel against interlocutory appeal before a complete factual record is established. Plaintiffs reason that the banks have not yet been "cowed" into settling, nor are they likely to be; the district court has afforded procedural fairness to all parties; and the panel should defer to its judgment by declining to hear this appeal until after the district court has entered a final judgment.

The fact that the banks have not yet been persuaded to settle is no reason to decline a rule 23(f) appeal; it means only that the litigation continues. As we have recognized, class certification may be the backbreaking decision that places "insurmountable pressure" on a defendant to settle, even where the defendant has a good chance of succeeding on the merits. *See Castano v. Am. Tobacco*, 84 F.3d 734, 746 (5th Cir. 1996). Here, where plaintiffs seek to hold the banks liable for nearly the entirety of securities losses stemming from the Enron collapse, settlement pressure appears to be particularly acute, so it is appropriate to provide appellate review before settlement may be coerced by an erroneous class certification decision.

Moreover, although the legal issues underlying the certification decision are intertwined with the merit of plaintiffs' theory of liability, these broad legal issues are not especially contingent on particular facts likely to be further developed in the district court. This case gives rise to unsettled questions of law concerning the entanglement of the merits with the class certification decision, as well as the district court's theory of "deceptive act" liability underlying its finding that common issues of reliance predominate. Both of the Advisory Committee criteria are met here, so we pro-

ceed to consider the rule 23(f) appeal.

IV.

We review class certification decisions for abuse of discretion in "recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation. . . . Whether the district court applied the correct legal standard in reaching its decision on class certification, however, is a legal question that we review de novo." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 408 (5th Cir. 1998) (citations omitted). Where a district court premises its legal analysis on an erroneous understanding of governing law, it has abused its discretion. *See Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005). Albeit with the best of intentions and after herculean effort, the district court arrives at an erroneous understanding of securities law that gives rise to its application of classwide presumptions of reliance.

V.

We first consider the scope of our jurisdiction. Plaintiffs accuse the banks of repackaging this rule 23(f) appeal as a demurrer. They point out that the scope of our review is "bridled by Rule 23(f)."[6] They urge us to refuse to consider the banks' arguments concerning the interpretation of § 10(b) and the prohibition of aiding and abetting liability under that statute.[7] They contend that we should accept the dis-

---

[6] *Bell v. Ascendant Solutions Inc.*, 422 F.3d 307, 314 (5th Cir. 2005) (declining to review, on interlocutory appeal, a district court's decision to preclude plaintiffs' expert from testifying as to market efficiency).

[7] *See Cent. Bank*, 511 U.S. at 177 (holding that § 10(b) does not provide for aiding and abetting liability).

trict court's view of the underlying theories of liability as valid for purposes of this appeal.

The scope of our review is limited, but it is not quite so circumscribed as plaintiffs say. Although we may not conduct an independent inquiry into the legal or factual merit of this case as though we were reviewing a motion under Federal Rule of Civil Procedure 12(b)(6) or 56, we may address arguments that implicate the merits of plaintiffs' cause of action insofar as those arguments also implicate the merits of the class certification decision.

Rule 23(f) states that "[a] court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order." FED. R. CIV. P. 23(f). The text of the rule makes plain that the sole order that may be appealed is the class certification; "no other issues may be raised." *Bell*, 422 F.3d at 314. The fact that an issue is relevant to both class certification and the merits, however, does not preclude review of that issue.

After all, the Supreme Court has refused to designate class certification decisions as collateral orders subject to interlocutory appellate review, precisely because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (internal citations omitted). "The analysis under Rule 23 must focus on the requirements of the rule, and if findings made in connection with those requirements overlap findings that will have to be made on the merits, such overlap is only coincidental." *Bell*, 422 F.3d at 311. *See also Unger*, 401 F.3d at 320.

Our circuit's conclusion that review of the

factual and legal analysis supporting the district court's decision is appropriate on review of class certification enjoys widespread acceptance in the courts of appeals,[8] and neither the Supreme Court authority nor the Fifth Circuit caselaw that plaintiffs cite for the proposition that no merits inquiry is permitted is to the contrary.[9] *Miller* and *Eisen* (which cited *Miller* to establish the "no merits inquiry" rule) addressed cases in which district courts had conducted wide-ranging inquiries into the merits of claims as part of the class certification decision without reference to the criteria for class certification.[10] As the *Bell* rule cited

---

[8] *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *Gariety v. Grant Thornton LLP*, 368 F.3d 356, 366 (4th Cir. 2004); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 166 (3d Cir. 2001) (quoting 5 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.46[4]: "[B]ecause the determination of a certification request invariably involves some examination of factual and legal issues underlying the plaintiffs' cause of action, a court may consider the substantive elements of the plaintiffs' case . . . ."); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001) ("The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it . . . . Before deciding whether to allow a case to proceed as a class action . . . a judge should make whatever factual and legal inquiries are necessary under Rule 23 . . . and if some of the considerations under Rule 23(b)(3) . . . overlap the merits . . . then the judge must make a preliminary inquiry into the merits.").

[9] *See Eisen v. Carlisle & Jaquelin*, 417 U.S. 156, 178 (1974); *Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir. 1971).

[10] *See In re Initial Pub. Offering Sec. Litig.*,
(continued...)

6

above suggests, the prohibition against looking into the merits applies only to such inquiries, not to evaluations of the merits that overlap with consideration of the requirements for class certification. *Id.* In a rule 23(f) appeal, this court can, and in fact must, review the merits of the district court's theory of liability insofar as they also concern issues relevant to class certification.[11]

VI.

Two of the banks' arguments on appeal have considerable implications for the substantive legal merit of plaintiffs' complaint. First, the district court's definition of "deceptive act" underlies its application of the classwide presumption of reliance on fraud on the market. Likewise, its broad theory of "scheme" liability allows it to certify a single class of plaintiffs whose losses were caused in common by the scheme rather than to certify subclasses whose losses were caused by the actions of individual defendants. Both of these arguments are also highly relevant to class certification, but we address only the definition of "deceptive act,"

because it is dispositive of this appeal.

The district court's definition of "deceptive act" is integral to its conclusion that the requirements for class certification are met. Federal Rule of Civil Procedure 23(a) requires plaintiffs seeking class certification to satisfy four criteria that we have previously summarized as (1) numerosity, (2) commonality, (3) typicality, and (4) representativeness.[12] Because no defendant seriously challenges whether these *prima facie* requirements are met, we do not discuss them further.

Once the rule 23(a) requirements are satisfied, a class may be certified if "[1] the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3). We refer to these two requirements respectively as the "predominance" and "superiority" criteria.[13]

The district court's theory of liability implicates primarily the predominance requirement. To succeed on a claim of securities fraud, a plaintiff must prove "(1) a material misrepresentation or omission by the defendant, (2) scienter on the part of the defendant, (3) reliance, and (4) due diligence by the plaintiff to pursue his or her own interest with care and good faith." *Unger*, 401 F.3d at 322 n.2 (5th Cir. 2005) (citations omitted). A plaintiff must prove not only that the fraud occurred but that it proximately caused his losses. *See*

---

[10](...continued)
471 F.3d at 24 (citations omitted).

[11] *See Langbecker v. Elect. Data Sys. Corp.*, 476 F.3d 299, 306-07 (5th Cir. 2007) (considering the scope of ERISA liability within the context of a rule 23(f) appeal and stating that "[a]lthough federal courts cannot assess the merits of the case at the certification stage, they must evaluate with rigor the claims, defenses, relevant facts and applicable substantive law in order to make a meaningful determination of the certification issues . . . . Courts should not confuse rulings on the merits of claims with the class certification decision . . . . However, the district court's threshold legal rulings are essential to its conclusion that this case may be maintained as a class action") (citations and internal quotation marks omitted).

[12] *See id.* at 307.

[13] *See Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 600 (5th Cir. 2006).

7

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

Without its broad conception of liability for "deceptive acts," the district court could not have found that the entire class was entitled to rely on *Basic*'s fraud-on-the-market theory, because the market may not be presumed to rely on an omission or misrepresentation in a disclosure to which it was not legally entitled.[14] The plaintiffs are likely correct that the

---

[14] *See Gariety v. Grant Thornton LLP*, 368 F.3d 356, 369 (4th Cir. 2004) (remanding class certification decision for consideration of whether it was improperly predicated on aiding and abetting liability under the guise of primary liability). The plaintiffs' attempt to distinguish *Gariety* on the ground that it involved a thinly traded stock is unpersuasive. Although the securities at issue were arguably too thinly traded to warrant the presumption of an efficient market (an issue addressed in another section of the opinion, *see id.* at 367-68), plaintiffs provide no alternative explanation why the *Gariety* court also remanded with instruction to consider the presumption of fraud-on-the-market reliance in light of *Central Bank. See Gariety*, 368 F.3d at 369.

The principle that, to rely presumptively, the market must be entitled to disclosure about the true nature of defendants' conduct, applies in the manipulation setting as well as in the deception context. *See* § 10(b) (prohibiting the employment of any "manipulative or deceptive device" in connection with the purchase or sale of registered securities). As the Supreme Court has said with respect to § 14(e) of the Securities Exchange Act (declaring it identical in relevant aspect to § 10), "[t]he use of the term 'manipulative' provides emphasis and guidance to those who must determine which types of acts are reached by the statute; it does not suggest a deviation from the section's facial and primary concern with disclosure . . . ." *Schreiber v.*
(continued...)

market for Enron securities was efficient and that inherent in that conclusion is the fact that the market price reflected all publicly available information.[15] But the factual probability that the market relied on the banks' behavior and/or omissions does not mean that plaintiffs are entitled to the *legal* presumption of reliance.

Market efficiency was not the sole condition that the Court in *Basic* required plaintiffs to prove existed to qualify for the classwide presumption; the defendant had to make public and material misrepresentations. *See Basic*, 485 U.S. at 248 n.27. If the banks's actions were non-public, immaterial, or not misrepresentative because the market had no right to rely on them (in other words, the banks owed no duty), the banks should be able to defeat the presumption. *See Gariety*, 368 F.3d at 369.

Without a classwide presumption of reliance, plaintiffs would have to prove individual reliance on defendants' conduct. "[A] fraud class action cannot be certified when individual reliance will be an issue." *Castano*, 84 F.3d at 745. Because, as we will explain, the district court misapplies the *Affiliated Ute* presumption, the fraud-on-the-market presumption is the only presumption potentially available in this case. Accordingly, the meaning of "deceptive act" is critical to classwide certification; classwide reliance stands or falls with it.

Erroneous presumptions of reliance were at

---

[14](...continued)
*Burlington N. Inc.*, 472 U.S. 1, 8 (1985).

[15] *See generally* Jonathan R. Macey and Geoffrey P. Miller, *Good Finance, Bad Economics: An Analysis of the Fraud-on-the-Market Theory*, 42 STAN. L. REV. 1059, 1077 (1990).

the heart of the Supreme Court's concern when it ruled that § 10(b) does not give rise to aiding and abetting liability.[16] It is essential for us to ensure that the district court does not misapply aiding-and-abetting liability under the guise of primary liability, through an overly broad definition of "deceptive act[s]," and thereby give rise to an erroneous classwide presumption of fraud on the market.

## VII.

We proceed to the merits of this limited rule 23(f) appeal. With all respect for the district court's diligent efforts, its determination that the *Affiliated Ute* presumption applies to the facts of this case is incorrect. In *Affiliated Ute*, the Court considered whether a group of investors was required to prove reliance affirmatively where it alleged that bank officers bought their restricted stock without disclosing the bank's creation of a secondary market in which the stock would be resold for profit. *See* 406 U.S. at 133-39. The Court ruled that the investors' allegations were not based on misrepresentation under what is now rule 10b-5(b), but instead on a "'course of business' or a 'device, scheme or artifice' that operated as a fraud" under what are now rule 10b-5(a) and (c). *Id.* at 153. The Court determined that, unlike a mere transfer agent, these bankers had a duty to disclose the existence of this secondary market to the plaintiffs. *Id.* at 152-53.

Where liability is premised on a failure to disclose rather than on a misrepresentation, "positive proof of reliance is not a prerequisite to recovery. . . . This obligation to disclose

and the withholding of a material fact establish the requisite element of causation in fact." *Id.* at 153-54. In *Basic*, 485 U.S. at 243, the Court later summarized the rule of *Affiliated Ute* thusly: "[W]here a duty to disclose material information had been breached . . . the necessary nexus between the plaintiffs' injury and the defendants' wrongful conduct had been established."

For us to invoke the *Affiliated Ute* presumption of reliance on an omission, a plaintiff must (1) allege a case primarily based on omissions or non-disclosure and (2) demonstrate that the defendant owed him a duty of disclosure.[17] The case at bar does not satisfy this conjunctive test.

Assuming *arguendo* that plaintiffs' case primarily concerns improper omissions,[18] the banks were not fiduciaries and were not otherwise obligated to the plaintiffs. They did not owe plaintiffs any duty to disclose the nature of the alleged transactions. The district court agrees that the banks lacked any specific duty, but, citing our caselaw, the court finds that the

---

[16] *See Cent. Bank*, 511 U.S. at 180 (explaining that aiding and abetting liability would permit plaintiffs to "circumvent the reliance requirement," because a "defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions").

[17] *See Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1119 (5th Cir. 1988) (explaining that the *Affiliated Ute* presumption applies where "the defendant has failed to disclose any information whatsoever relating to material facts about which the defendant has a duty to the plaintiff to disclose"), *vacated on other grounds sub nom. Fryar v. Abell*, 492 U.S. 914 (1989).

[18] *See Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 360 (5th Cir. 1987) ("Cases involving primarily a failure to disclose implicate the first and third subsections of Rule 10b-5; cases involving primarily a misstatement or failure to state a fact necessary to make statements made not misleading implicate the second subsection.") (citation omitted).

9

presumption applies because the banks omitted their duty not to engage in a fraudulent scheme.[19] Neither *Smith* nor any other of this circuit's cases is authority for that proposition.

As we will explain in more detail, "deception" within the meaning of § 10(b) requires that a defendant fail to satisfy a duty to disclose material information to a plaintiff. Merely pleading that defendants failed to fulfill that duty by means of a scheme or an act, rather than by a misleading statement, does not entitle plaintiffs to employ the *Affiliated Ute* presumption. In *Smith*, this court discussed only the first element of the *Abell* test recounted above; *Smith* stands for the straightforward proposition that a case brought under rule 10b-5(a) or (c) is more likely to be based primarily on omission than is a case under rule 10b-5(b), which requires that a defendant affirmatively make a misleading representation.[20] In *Smith*, we never reached the second prong of the *Abell* test, because we determined that, even if there had been an omission, any presumption of reliance was rebutted (because the plaintiff would have behaved identically had he been aware of the omitted information). *See*

---

[19] *Regents*, 2006 U.S. Dist. LEXIS 43146, at \*102 (citing *Smith v. Ayres*, 845 F.2d 1360, 1363 & n.8 (5th Cir. 1988)).

[20] The statement may be misleading for the reason that the defendant has "omitt[ed] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," but to allege a cause of action under rule 10b-5(b), a plaintiff still must allege that a defendant said *something*. *See* 17 C.F.R. § 240.10b-5(b); *Smith*, 845 F.2d at 1363 (stating that a rule 10b-5(b) "claim always rests upon an affirmative statement of some sort, reliance on which is an essential element plaintiff must prove").

*Smith*, 845 F.2d at 1364.

*Abell* is the law of this circuit, and *Smith* is not to the contrary. When it determined (correctly) that the banks owed no duty to the plaintiffs other than the general duty not to engage in fraudulent schemes or acts (that is, the duty not to break the law), the district court should have declined to apply the *Affiliated Ute* presumption. Instead, it presumed what the plaintiffs had only alleged: that reliance, which is a specific, defining element of the relevant legal violation, had in fact occurred.

The logic of *Affiliated Ute* is that, where a plaintiff is entitled to rely on the disclosures of someone who owes him a duty, requiring him to prove "how he would have acted if omitted material information had been disclosed" is unfair. *Basic*, 485 U.S. at 245. It is natural to expect a plaintiff to rely on the candor of one who owes him a duty of disclosure, and it is fair to force one who breached his duty to prove that the plaintiff did not so rely. Here, however, where the plaintiffs had no expectation that the banks would provide them with information, there is no reason to expect that the plaintiffs were relying on their candor. Accordingly, it is only sensible to put plaintiffs to their proof that they individually relied on the banks' omissions.

## VIII.

Having determined that the *Affiliated Ute* presumption is inapplicable, we proceed to review the district court's determination that *Basic*'s fraud-on-the-market presumption applies. It does not; the court predicates its ruling on an erroneous interpretation of § 10(b).

The banks launch a two-pronged attack on the district court's ruling with respect to fraud on the market. First, they argue that the presumption was never properly established: The

district court's overly broad definition of "deceptive act" led it inexorably to the mistaken conclusion that the banks' actions constituted "misrepresentations" on which the market was legally presumed to rely. Second, the banks assert that, even if the plaintiffs did establish the presumption, it was rebutted according to this court's standards.[21] Because the district court erred in ruling that the presumption had been established, we do not address whether it was rebutted.

In *Basic*, 485 U.S. at 245, the Court accepted the fraud-on-the-market theory that courts could presume reliance where individuals who had traded shares did so "in reliance on the integrity of the price set by the market, but because of [defendant's] material misrepresentations, that price had been fraudulently [altered]." The presumption is founded on the economic hypothesis that "the market is transposed between seller and buyer, and ideally, transmits information to the investor in the processed form of the market price . . . . The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price." *Id*. at 246 (citing *In re LTV Sec. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)).

To qualify for the presumption, however, a plaintiff must not only indicate that a market is efficient, but also must allege that the defendant made public and material misrepresentations; i.e., the type of fraud on which an efficient market may be presumed to rely.[22] These

plaintiffs have not alleged such fraud.

The district court's conception of "deceptive act" liability is inconsistent with the Supreme Court's decision that § 10 does not give rise to aiding and abetting liability. An act cannot be deceptive within the meaning of § 10(b) where the actor has no duty to disclose. Presuming plaintiffs' allegations to be true, Enron committed fraud by misstating its accounts, but the banks only aided an abetted that fraud by engaging in transactions to make it more plausible; they owed no duty to Enron's shareholders.

Section 10(b) does not give rise to aiding and abetting liability.[23] In *Central Bank*, the Court emphasized that securities fraud liability is an area of the law that demands certainty and predictability. Secondary liability brings neither; instead it gives rise to confusion about the extent of secondary actors' obligations and invites vague and conflicting standards of proof in divers courts. *See Cent. Bank*, 511

---

[22](...continued)
ing prerequisites for the *Basic* presumption as follows: "(1) [T]he defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed"). *See also Gariety*, 368 F.3d at 369 (remanding the class certification decision for consideration of whether factor (1) had been improperly satisfied by the erroneous application of aiding and abetting liability).

[23] *Cent. Bank*, 511 U.S. at 177 (declaring that section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. The proscription does not include giving aid to a person who commits a manipulative or deceptive act.") (citations omitted).

---

[21] *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004); *Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir. 2001).

[22] *See Greenberg*, 364 F.3d at 661 (summariz-

(continued...)

U.S. at 188. Unfortunately, the Court has left some uncertainty in this regard.

Though the Court conclusively foreclosed the application of secondary liability under § 10(b), it stated that secondary actors such as investment banks and accountants can be liable as primary violators in some circumstances. *Id*. at 191. The Court has never, however, precisely delineated the boundary between primary and secondary liability. As the district court noted, the lower courts have struggled to do so, and our circuit has not previously announced a standard that conclusively governs this case.

Although plaintiffs try to reconcile the cases, the Eighth and Ninth Circuits have split with respect to the scope of primary liability for secondary actors.[24] The district court adopts a rule advocated by the Securities and Exchange Commission ("SEC"), in an *amicus curiae* brief before the Ninth Circuit, under which primary liability attaches to anyone who engages in a "transaction whose principal purpose and effect is to create a false appearance

of revenues."[25] We agree with the Eighth Circuit that the SEC's proposed test (by which we are not bound) is too broad to fit within the contours of § 10(b).

The appropriate starting point is the text of the statute. *See Cent. Bank*, 511 U.S. at 172-73. Decisions interpreting the statutory text place a limit on the possible definitions that can be ascribed to the words contained in the SEC's rule promulgated thereunder.[26] It is by losing sight of the limits that the statute places on the rule, and by ascribing, natural, dictionary definitions to the words of the rule, that the district court and likeminded courts have

---

[24] *Compare Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048 (9th Cir. 2006) ("[T]o be liable as a primary violator of § 10(b) for participation in a 'scheme to defraud,' the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme."), *petition for cert. filed* (Oct. 19, 2006) (No. 06-560) *with In re Charter Commc'ns, Inc., Sec. Litig.*, 443 F.3d 987, 992 (8th Cir. 2006) ("[A]ny defendant who does not make or affirmatively cause to be made a fraudulent statement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5."), *petition for cert. filed* (July 7, 2006) (No. 06-43).

[25] As defendants aver, the district court's test in this case is actually broader even than the Ninth Circuit's; *Simpson* did not adopt the SEC's proposed rule wholesale. Instead, the court there made it plain that "[i]t is not enough that a *transaction* in which the defendant was involved had a deceptive purpose and effect; the defendant's *own conduct* contributing to the transaction or overall scheme must have had a deceptive purpose and effect." *Simpson*, 452 F.3d at 1048. This distinction, however, is irrelevant for purposes of this appeal, because the defendants' scienter in entering into the transactions would be a common issue of fact across all the plaintiffs.

We note also that the Ninth Circuit applied the definition recounted above to "scheme" as well as to "deceptive act." *Id*. Because, however, our analysis is ultimately predicated on the statute instead of the rule, any distinction between subsections of the rule is immaterial to our discussion.

[26] *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214 (1976) ("[D]espite the broad view of the Rule advanced by the [SEC] in this case, its scope cannot exceed the power granted the Commission by Congress under § 10(b).").

12

gone awry.[27]

*Central Bank* was informed by a series of decisions construing the statute and narrowly defining the scope of "fraud" in the context of securities. In *Ernst & Ernst*, 425 U.S. 185 at 197, for example, the Court rejected the SEC's notion that securities fraud can be committed negligently; it has to be knowing. Even more significantly for purposes of this case, the Court later stated that "the language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception." *Santa Fe Indus. v. Green*, 430 U.S. 462, 473 (1977). The Court had already discussed "manipulation" in *Ernst & Ernst*: "Use of the word 'manipulative' is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst*, 425 U.S. at 199.

The Court further refined that definition by stating that "[manipulation] refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa Fe*, 430 U.S. at 476. Finally, when evaluating the scope of liability for deceptive omissions of disclosure in the context of insid-

er trading, the Court stated, "When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 234 (1980).

The Eighth Circuit, unlike the Ninth, has correctly taken these decisions collectively to mean that "'deceptive' conduct involves either a misstatement or a failure to disclose by one who has a duty to disclose." *Charter*, 443 F.3d at 990. That court quoted the technical definition of "manipulation" from *Santa Fe* and stated that "any defendant who does not make or affirmatively cause to be made a fraudulent statement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under § 10(b) or any subpart of Rule 10b-5." *Id.* at 992.

By this holding the court in *Charter* found that there was no liability against vendors of set-top cable boxes who had sold their boxes to Charter at inflated prices subject to a kickback agreement whereby they would direct the value of the price inflation back to Charter in the form of advertising purchases. *See id.* at 989-90. The vendors were alleged to have known that Charter was doing this to falsify its accounts by depreciating its expenses, as capital investments, from the purchase of the set-top boxes, but was booking the increased advertising fees as recurring revenue. *See id.* In other words, the court dismissed the case on facts extraordinarily similar to the facts that are present here.[28]

---

[27] *See Simpson*, 452 F.3d at 1048; *SEC v. Hopper*, No. H-04-1054, 2006 U.S. Dist. LEXIS 17772, at *37 (S.D. Tex. Mar. 24, 2006); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005); *Quaak v. Dexia, S.A.*, 357 F. Supp. 2d 330, 342 (D. Mass. 2005); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336-37 (S.D.N.Y. 2004)*; In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003).

---

[28] The Eighth Circuit's analysis finds support in several prior cases in other circuits that had refused to extend primary liability to secondary actors,
(continued...)

The Ninth Circuit came to a different conclusion. In *Simpson*, the defunct company (Homestore.com) "bought revenue" by engaging in the same type of round-trip transactions that took place in *Charter* and are alleged to have occurred here. *Simpson*, 452 F.3d at 1043-44. It paid inflated prices for shares or services from thinly capitalized companies looking to generate liquidity so they could go public, in return for which it extracted side agreements that the companies would pay back the value of the inflation by buying advertising from AOL to be displayed at Homestore's AOL-based website. Like Charter, Homestore would then list its payments to the other companies as capital investments but would characterize its advertising income from them as recurring revenue. *See id*.

Although the defendants were dismissed because they did not meet the standard for liability that the Ninth Circuit announced, the court promulgated a standard very similar to the one the instant plaintiffs urge us to adopt. The court concluded:

[C]onduct by a defendant that had the principal purpose and effect of creating a false appearance in deceptive transactions as part of a scheme to defraud is conduct that uses or employs a deceptive device within the meaning of § 10(b). Furthermore, such conduct may be in connection with the purchase or sale of securities if it is part of a scheme to misrepresent public financial information where the scheme is not complete until the misleading information is dis-

seminated into the securities market. Finally, a plaintiff may be presumed to have relied on this scheme to defraud if a misrepresentation, which necessarily resulted from the scheme and the defendant's conduct therein, was disseminated into an efficient market and was reflected in the market price.

*Id*. at 1052. *See also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 481-90 (S.D.N.Y. 2005).

The Ninth Circuit relied in part on a law review article that had questioned the assertion that a defendant could be liable only for its own statements because § 10(b) forbids the use of a "device" and rule 10b-5 condemns those who act "indirectly."[29] What this reasoning overlooks is that the Supreme Court had appeared to limit the scope of "deception" rather than the scope of "device."

The Supreme Court has defined "device" by referring to a dictionary but has pointedly refused to define "deceptive" in any way except through caselaw: "[D]evice" means "(t)hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice," and "contrivance" in pertinent part as "(a) thing contrived or used in contriving; a scheme, plan, or artifice." In turn, "contrive" in pertinent part is defined as "(t)o devise; to plan; to plot . . . (t)o fabricate . . . design; invent . . . to scheme . . . ." *Ernst & Ernst*, 425 U.S. at 199 n.20 (citing WEBSTER'S INTERNA-

---

[28](...continued)
albeit in non-transactional scenarios. *See Ziemba v. Cascade Int'l*, 256 F.3d 1194, 1205 (11th Cir. 2001); *Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996).

[29] *See Simpson*, 452 F.3d at 1049 (citing Robert Prentice, *Locating That "Indistinct" and "Virtually Nonexistent" Line Between Primary and Secondary Liability Under Section 10(b)*, 75 N.C. L. REV. 691, 731 (1997)).

TIONAL DICTIONARY (2d ed. 1934)). Having established the meaning of "device" (and relying on it to hold that § 10(b) requires scienter), the Court, in its other cases interpreting § 10(b), has established that a device, such as a scheme, is not "deceptive" unless it involves breach of some duty of candid disclosure.[30]

For this reason, defining "deceptive" by referring to the same dictionary the Court used to define "device"SSthe approach taken by the court in *Parmalat*, 376 F. Supp. 2d at 502, and approvingly cited by the district court *a quo*SSis improperly to substitute the authority of the dictionary for that of the Supreme Court. Likewise, plaintiffs' reference to the common law meaning of "deceptive" is fruitless; where the Supreme Court has authoritatively construed the pertinent language of the statute giving rise to the plaintiffs' cause of ac-

tion, the common law meaning of that language is irrelevant.

Although some of our securities cases have considered the common law where the Supreme Court has placed no gloss on the relevant terms, none of this court's decisions has contradicted either the fundamental principle just stated or the Supreme Court's interpretation of "deceptive."[31] Because "device" is modified by "deceptive," no device can be illegal if it is not deceptive within the meaning of the statute. Similarly, because the rule may not be broader than the statute, this conclusion as to the meaning of "deceptive device" precludes an interpretation of "indirectly" that contradicts the accepted meaning of "deception."[32]

The district court's definition of "deceptive acts" thus sweeps too broadly; the transactions in which the banks engaged were not encompassed within the proper meaning of that phrase. Enron had a duty to its shareholders, but the banks did not. The transactions in which the banks engaged at most aided and abetted Enron's deceit by making its misrepre-

---

[30] *See, e.g.*, *Chiarella*, 445 U.S. at 234-35 ("When an allegation of fraud is based upon non-disclosure, there can be no fraud absent a duty to speak. . . . We hold that a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information."). *See also United States v. O'Hagan*, 521 U.S. 642, 655 (1997) ("Because the deception essential to the misappropriation theory involves feigning fidelity to the source of information, if the fiduciary discloses to the source that he plans to trade on the nonpublic information, there is no 'deceptive device' and thus no § 10(b) violation."); *id*. at 656 ("The securities transaction and the breach of duty thus coincide. . . . A misappropriator who trades on the basis of material, nonpublic information, in short, gains his advantageous market position through deception; he deceives the source of the information and simultaneously harms members of the investing public.") We take the quoted statements to mean that "deception" occurs where the misappropriator breaches his duty to his source, the act/scheme/-omission (collectively "device") is the trading of the security without disclosure.

[31] *See Finkel v. Docutel/Olivetti*, 817 F.2d 356, 359 (5th Cir. 1987) (referring to the common law and determining that § 10(b) requires transaction causation); *Shores v. Sklar*, 647 F.2d 462, 469 n.5 (5th Cir. May 1981) (en banc) (citing the Restatement of Torts for the proposition that securities fraud requires loss causation); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 547 n.21 (5th Cir. Unit A Mar. 1981) (citing Prosser as authority for requirement of scienter in securities fraud), *vacated on other grounds*, 459 U.S. 375 (1983).

[32] *See Cent. Bank*, 511 U.S. at 173 (establishing that rule 10b-5 may not exceed the scope of § 10(b)).

15

sentations more plausible.[33] The banks' participation in the transactions, regardless of the purpose or effect of those transactions, did not give rise to primary liability under § 10(b).

## IX.

Having determined that the banks' alleged actions were not "misrepresentations" in the sense of "deceptive acts" on which an efficient market may be presumed to rely, we proceed to consider whether they constituted manipulation.[34] They did not.

Manipulation requires that a defendant act directly in the market for the relevant security. The Supreme Court has cited a dictionary definition of the word but, at the same time, has attached the caveat that, as used in securities fraud law, it is "virtually a term of art." *Ernst & Ernst*, 425 U.S. at 199 & n.21. Although

the Court has not precisely defined the term beyond providing a few examples such as wash sales, matched orders, and rigged prices, then-District Judge Higginbotham, in an influential opinion issued shortly after *Santa Fe*, exhaustively analyzed the meaning of "manipulation" and concluded that "[f]rom this study, the following definition emerges: practices in the marketplace which have the effect of either creating the false impression that certain market activity is occurring when in fact such activity is unrelated to actual supply and demand or tampering with the price itself are manipulative." *Hundahl v. United Benefit Life Ins. Co.*, 465 F. Supp. 1349, 1360 (N.D. Tex. 1979).

In *Hundahl*, Judge Higginbotham carefully emphasized that such activity could not take place outside the market for the relevant security and retain the title of manipulation; conduct that affects the marketplace indirectly can violate § 10(b) only if it constitutes deception. *Id.* at 1359, 1362. Like the Eighth Circuit, we adopt Judge Higginbotham's reasoning and definition in full, and we are aware of no circuit that recognizes a broader definition. *See Charter*, 443 F.3d at 992 n.2.

Plaintiffs argue that this course is foreclosed to us by *Schreiber v. Burlington Northern Inc.*, 472 U.S. 1, 6-7 (1985), and *Shores*. We disagree. In *Schreiber*, 472 U.S. at 6, the Court declared only that its definition of manipulation, insofar as it had defined that term in *Ernst & Ernst*, is consistent with both the dictionary and the common law. So is Judge Higginbotham's.

In *Hundahl*, Judge Higginbotham thoroughly analyzed the common law history of the term and concluded that the "manipulation" cause of action was primarily concerned with keeping free markets clear of interference

---

[33] *See Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983) (explaining that before *Central Bank*, aiding and abetting securities fraud required proof of "(1) a securities law violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) . . . that the person sought to be charged substantially assisted in the primary wrongdoing"). We agree with the court in *Parmalat* that whether the banks would have been guilty of aiding and abetting, had their actions taken place before *Central Bank*, is not particularly important; if they have committed a primary violation as well, the fact that their conduct could also be characterized as aiding and abetting would not save them. *See Parmalat*, 376 F. Supp. 2d at 493. What is important is that plaintiffs have not pleaded that the banks have committed the primary violation of employing a "deceptive device."

[34] *See* § 10(b); *Santa Fe*, 430 U.S. at 473 (stating that "the language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception").

but does not reach all conduct that might constitute deception or breach of fiduciary duty. *See Hundahl*, 465 F. Supp. at 1359-62. The Court in *Schreiber*, 472 U.S. at 7, citing *Santa Fe,* adopted a similar limited construction to determine that not all breaches of state law fiduciary duty constituted manipulation for purposes of the federal securities laws. The fact that the Supreme Court's definition of "manipulation" is consistent with the dictionary's does not mean that it is coextensive with it; "manipulation" is a term of art, and it applies only to conduct that takes place directly within the market for the relevant security.

Our holding in *Shores* requires somewhat more explanation. In that case, we adopted the "fraud-created-the-market" theory, whereby actors who introduced an otherwise unmarketable security into the market by means of fraud are deemed guilty of manipulation, and a plaintiff can plead that he relied on the integrity of the market rather than on individual fraudulent disclosures. *Shores*, 647 F.2d at 469-70 & n.8. We determined that lawyers and other secondary actors involved in preparing the fraudulent statements that facilitated introduction of the otherwise unmarketable security could be liable for the plaintiff security purchaser's loss. *See id*.

*Shores* does not preclude the decision we reach in this case. The basis of the fraud-created-the-market theory is that the fraudster directly interfered with the market by introducing something that is not like the others: an objectively unmarketable security that has no business being there.[35] This is qualitatively different from what the banks are alleged to have done, namely engage in transactions elsewhere that gave a misleading impression of the value of Enron securities that were already on the market.[36] Moreover, in *Shores* the manipulation happened when the bogus security was introduced into the market; lawyers and other secondary actors were rendered liable for having conspired to achieve that end.[37] In the wake of *Central Bank*, however, conspiracy is no longer a viable theory of § 10(b) liability, so that aspect of *Shores* has been overruled.[38]

---

[35](...continued) enterprise itself was patently worthless").

[36] At oral argument, plaintiffs' counsel contended that in *Finkel v. Docutel/Olivetti*, 817 F.2d 356 (5th Cir. 1987), this court expanded the fraud-on-the-market presumption from *Shores* to reach circumstances like the case at bar. In fact, *Finkel* established, pre-*Basic*, that the fraud-on-the-market presumption applies to allegations of deceptive omissions within the limited meaning of "deceptive" that we have described above. *Id.* at 362. We did not broaden the concept of manipulation. Likewise, plaintiffs' citation of *SEC v. Zandford*, 535 U.S. 813, 819 (2002), misses the mark. Deception, as occurred in that case, need not coincide with a defendant's activity in the market for the relevant securities; manipulation must so coincide.

[37] *See Shores,* 647 F.2d at 469 ("[Plaintiff's] burden of proof will be to show that (1) the defendants knowingly *conspired* to bring securities onto the market which were not entitled to be marketed.") (emphasis added).

[38] *See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 842 (2d Cir. 1998); *In re GlenFed, Inc. Sec. Litig.*, 60 F.3d 591, 592 (9th Cir. 1995). *See also Cent. Bank*, 511 U.S. at 201 n.12 (Stevens, J., dissenting) ("The Court's rationale would sweep away the decisions recognizing that a defendant may be found (continued...)

---

[35] *See Abell*, 858 F.2d at 1122 (explaining that under *Shores*, "the test of 'not entitled to be marketed' [is met] only where the promoters knew the (continued...)

17

Nothing in today's decision contradicts our precedent. Applying the *Hundahl* definition of manipulation, we conclude that the banks' actions are not alleged to be the type of manipulative devices on which an efficient market may be legally presumed to rely because the banks did not act directly in the market for Enron securities.

## X.

As the Supreme Court did in *Central Bank*, it may be worth taking into account certain policy considerations to determine whether our interpretation of § 10(b) plausibly accords with the will of Congress. Defendants do, after all, escape liability for alleged conduct that was hardly praiseworthy. According to plaintiffs, defendants could have pulled the plug on the Enron fraud; instead they profited from it while large numbers of people eventually lost an aggregate sum in the tens of billions of dollars.

Ultimately, however, the rule of liability must be either overinclusive or underinclusive so as to avoid what *Hundahl* called "*in terrorem* settlements" resulting from the expense and difficulty of, even meritoriously, defending this kind of litigation. *Hundahl*, 465 F. Supp. at 1363.[39] Strict construction of § 10(b) against inputting aiding and abetting liability for secondary actors under the rubric of "de-ceptive acts" or "schemes" gives rise to the type of certainty that the Court sought in *Central Bank*. The banks may exaggerate the length of the parade of horribles they present wherein defendants are continually taken out of and put back into endless securities cases based on, shifting, *ad hoc*, fact-based perceptions of liability influenced by plaintiffs' skill at artful pleading.

But the fact that the banks may be on to something serious might be best demonstrated by the fact that in *Simpson*, 452 F.3d at 1050, the court attempted to distinguish *Charter* as addressing an arms-length transaction not subject to primary liability, i.e., a ruling consistent with its own. If there is a distinct difference between the culpability of defendants' actions based on the pleadings in those two cases, it is not apparent to us and is likely beyond the understanding of good-faith financial professionals who are attempting to avoid liability.

This is not to say that the instant matter should be decided in accord with this court's policy preferences. We mention policy only to demonstrate that, even considering the scope of the Enron disaster, Congress was not irrational to promote plain legal standards for actors in the financial markets by limiting secondary liability. As the Eighth Circuit has said,

> To impose liability for securities fraud on one party to an arm's length business transaction in goods or services other than securities because that party knew or should have known that the other party would use the transaction to mislead investors in its stock would introduce potentially far-reaching duties and uncertainties for those engaged in day-to-day business dealings. Decisions of this magnitude should be made by Congress.

---

[38](...continued) liable in a private action for conspiring to violate § 10(b) and Rule 10b-5.").

[39] Again we quote Judge Higginbotham, finding his words in *Hundahl*, 465 F. Supp. at 1363, applicable to this case: "This suit is hardly of the strike variety. The plaintiffs [were] substantial shareholders. They are represented by distinguished and able counsel. It is the precedential force of the rule that is here addressed."

*Charter*, 443 F.3d at 992-93.

## XI.

The necessity of establishing a classwide presumption of reliance in securities class actions makes substantial merits review on a rule 23(f) appeal inevitable. A classwide presumption of reliance is not only crucial to class certification, it *prima facie* establishes a critical element of the substantive tort. Reliance "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic*, 485 U.S. at 243. Where the plaintiffs' several interactions with the market are alleged to supply the basis for their joint reliance on defendants' conduct, we must examine carefully the third leg of that metaphorical triangle: the legal nature of defendants' interactions with the market.

If, as is probably the case here, that legally appropriate examination makes interlocutory appeals in securities cases practically dispositive of the merits, we take comfort in two observations. First, the availability of broad presumptions in this area means that the legal merit of securities cases is somewhat less likely than that of other cases to be contingent on facts that have been only incompletely developed at the time of class certification. Second, as we observed in *Castano*, 84 F.3d at 746, class certification is often practically dispositive of litigation like the case at bar. If the certification decision is so entangled with the merits as to make interlocutory appeal dispositive of the substantive litigation, it is incidentally but perhaps happily more likely that the legal merit and practical outcome of securities cases will coincide.

We recognize, however, that our ruling on legal merit may not coincide, particularly in the minds of aggrieved former Enron shareholders who have lost billions of dollars in a fraud they allege was aided and abetted by the defendants at bar, with notions of justice and fair play. We acknowledge that the courts' interpretation of § 10(b) could have gone in a different direction and might have established liability for the actions the banks are alleged to have undertaken. Indeed, one of our sister circuitsSSthe NinthSSbelieves that it did. We have applied the Supreme Court's guidance in ascribing a limited interpretation to the words of § 10, viewing the statute as the result of Congress's balancing of competing desires to provide for some remedy for securities fraud without opening the floodgates for nearly unlimited and frequently unpredictable liability for secondary actors in the securities markets.

In summary, the *Affiliated Ute* presumption of classwide reliance cannot apply here. Likewise, the district court, albeit with the best of intentions, misapplied the fraud-on-the-market presumption; the facts alleged do not constitute misrepresentations on which an efficient market may be presumed to rely.

Because no class may be certified in a § 10(b) case without a classwide presumption of reliance, our analysis of reliance disposes of this appeal. We decline to address whether, had defendants' actions been misrepresentations on which the market was presumed to rely, they would have been appropriately grouped together as a unitary scheme giving rise to common issues of loss causation among the class members. Likewise, we abstain from addressing the manageability of the district court's plan to implement the proportionate liability provisions of the PSLRA.

The order certifying a class is REVERSED and REMANDED for further proceedings as appropriate. The motion to stay the trial is DENIED. The mandate shall issue forthwith.

DENNIS, Circuit Judge, concurring in the judgment:

I concur in the judgment reversing the district court's certification order, but I do so on grounds different from those assigned by the majority. I respectfully disagree with the majority as to the issues upon which it decides the case. Although I ultimately agree that the certification order must be reversed, I do not believe that the law necessarily prevents the plaintiffs from prosecuting this case as a class action, and, as I explain below, I would remand the case to the district court for further consideration of whether the criteria for certification have been satisfied.

The majority today holds that secondary actors (such as the investment banks involved in this case) who act in concert with issuers of publicly-traded securities in schemes to defraud the investing public cannot be held liable as primary violators of Section 10(b) or Rule 10b-5 unless they (1) directly make public misrepresentations; (2) owe the issuer's shareholders a duty to disclose; or (3) directly "manipulate" the market for the issuer's securities through practices such as wash sales or matched orders. In doing so, the majority aligns this court with the Eighth Circuit[1] and immunizes a broad array of undeniably fraudulent conduct from civil liability under Section 10(b), effectively giving secondary actors license to scheme with impunity, as long as they keep quiet.[2]

Although, as I explain below, I cannot agree with the majority's cramped interpretation of the statutory language of section 10(b), in my view, the majority commits a significant error by even

---

[1]See In re Charter Commc'ns, Inc. Sec. Litig., 443 F.3d 987 (8th Cir. 2006).

[2]The majority notes that the investment banks' alleged conduct was "hardly praiseworthy," but it brushes the significance of its decision to immunize their conduct aside by noting that "[u]ltimately, . . . the rule of liability must be either overinclusive or underinclusive." See supra, at ___.

20

reaching this issue. Because the issue on which the majority opinion bases its decision today — a significant and unsettled question about the scope of primarily liability under Section 10(b) — is unnecessary to a determination of whether the plaintiffs have satisfied the prerequisites for maintaining a class action under Federal Rule of Civil Procedure 23, we should not consider it on this interlocutory appeal of class certification.

The investment banks have, however, raised two substantial issues that are related to the district court's Rule 23 inquiry. The banks argue that the plaintiffs are not entitled to the fraud-on-the-market presumption of reliance because they have not satisfied the requirements of this court's decision in Greenberg v. Crossroad Systems, Inc., 364 F.3d 657 (5th Cir. 2004),[3] and that the district court erred when it concluded that any defendant found to have knowingly violated the securities laws could be held jointly and severally liable for all of the plaintiffs' losses in connection with Enron's multi-year fraudulent scheme. Greenberg, in my view, is inconsistent with prior precedents of the Supreme Court and this court insofar as it purports to relieve securities defendants of the burden of rebutting the fraud-on-the-market presumption. On the latter point, however, I conclude that the district court erred by construing too broadly the joint and several liability provision of the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4. I would remand the case to the district court to determine whether, applying the correct legal standard, common damages issues continue to predominate over individual issues and whether the case can be tried in a manageable fashion.

## I.

---

[3]Plaintiffs also seek to rely on the Affiliated Ute presumption of reliance. See Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972). I do not disagree with the majority's conclusion that the Affiliated Ute presumption does not apply in this case. See supra, at ___.

21

Our inquiry on this interlocutory appeal under Rule 23(f)[4] is limited to determining whether the district court erred in certifying the case as a class action. See Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 314 (5th Cir. 2005) (stating that Rule 23(f) permits a party to "'appeal only the issue of class certification; no other issues may be raised'") (quoting Bertulli v. Indep. Ass'n of Cont'l Pilots, 242 F.3d 290, 294 (5th Cir. 2001)).  We are not permitted to go beyond the issues necessary to class certification and rule on the merits of plaintiffs' claims.  See Unger v. Amedisys, Inc., 401 F.3d 316, 321 (5th Cir. 2005) ("Class certification hearings should not be mini-trials on the merits of the class or individual claims."); see also Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974) (noting that courts cannot "conduct a preliminary inquiry into the merits of a suit" on class certification).

It is clear, though, that a district court cannot certify a class action unless it finds that the plaintiffs have satisfied all of the requirements of Rule 23(a) and of one of the three subsections of Rule 23(b). To fulfill that obligation, it is often necessary for the district court to go "beyond the pleadings" and "understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." Castano v. Am. Tobacco Co., 84 F.3d 734, 744 (5th Cir. 1996).  In addition, to the extent that issues relevant to the ultimate merits of the case are also necessary to the district court's determination of one or more of the requirements of Rule 23, the district court can, and must, consider those issues at the class certification stage.  See Bell, 422 F.3d at 311-12; see also In re Initial Pub. Offering Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006)

---

[4]Fed. R. Civ. P. 23(f) provides:

> A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

("[T]here is no reason to lessen a district court's obligation to make a determination that every Rule 23 requirement is met before certifying a class just because of some or even full overlap of that requirement with a merits issue.").[5] By the same token, any such issues are also necessarily within the scope of our review on an interlocutory appeal of a district court's decision to certify a class. Like the district court, however, this court can consider issues relevant to the merits of the plaintiffs' claims only to the extent that such consideration is necessary to determine whether the proposed class satisfies the requirements of Rule 23. See Initial Pub. Offering, 471 F.3d at 41 ("[A] district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement.") (emphasis added).

In the majority's view, one of the issues that this court can review on this interlocutory appeal is the district court's conclusion that a secondary actor can be held liable as a primary violator of Section 10(b) and Rule 10b-5 for its participation in a scheme to defraud, even though it does not make a direct public misrepresentation or have a duty to speak.[6] According to the majority, the

---

[5]It is important to note that the factual findings made by the district court at the class certification stage are not binding on the trier of fact at trial. See Initial Pub. Offering, 471 F.3d at 41 ("[T]he determination as to a Rule 23 requirement is made only for purposes of class certification and is not binding on the trier of facts, even if that trier is the class certification judge."); Unger, 401 F.3d at 323 (stating that "the court's determination for class certification purposes may be revised (or wholly rejected) by the ultimate factfinder"); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 366 (4th Cir. 2004) ("The findings made for resolving a class action certification motion serve the court only in its determination of whether the requirements of Rule 23 have been demonstrated.").

[6]The district court initially held that secondary actors can be liable under Section 10(b) and Rule 10b-5 based on deceptive acts not involving a direct public misstatement or a duty to speak when it denied certain defendants' motions to dismiss the Section 10(b) claims against them. See In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 590-94 (S.D. Tex. 2002). In its opinion on class certification, the court reconsidered (and ultimately adhered to) its earlier views in light of recent developments in the case law, noting that it had "the power to reconsider such interlocutory decisions." See In re Enron Corp. Sec., Derivative & ERISA Litig., No. H-01-3624, 2006 U.S. Dist. LEXIS 43146, at *155 n.84 (S.D. Tex. June 5, 2006). The district court did not, however, indicate at any point that it believed that its decision on that issue was relevant to any
(continued...)

23

district court's determination that secondary actors can violate Section 10(b) and Rule 10b-5 by engaging in "deceptive" acts without making a public misrepresentation or having a duty to speak implicates Rule 23(b)(3)'s requirement that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Without that finding, the majority states, the district court could not have concluded that the plaintiffs were entitled to a classwide presumption of reliance, and individual issues of reliance would overwhelm the common, classwide issues, rendering class treatment inappropriate. Thus, the majority variously characterizes the district court's ruling on the scope of Section 10(b) liability as "integral" or "critical" to its class certification decision.

The majority opinion labors to create the impression of a relationship between the district court's decision that securities plaintiffs can state a Section 10(b) claim against a secondary actor who did not make any affirmative misstatements and the issue of whether the plaintiffs are entitled to rely on the fraud-on-the-market presumption of Basic Inc. v. Levinson, 485 U.S. 224 (1988). According to the majority, because the banks did not make public misstatements and had no duty to disclose vis-a-vis Enron's shareholders, their participation with Enron in fraudulent transactions that lacked any independent business purpose is beyond the reach of Section 10(b); because the banks' conduct is not actionable under Section 10(b), the plaintiffs cannot invoke a classwide presumption of reliance; and because reliance cannot be presumed on a classwide basis, individual issues of reliance predominate over common issues. In sum, the upshot of the majority's reasoning is that plaintiffs are not entitled to maintain a class action because the conduct for which they seek to recover — to take the

---

[6](...continued)
specific requirement of Rule 23.

24

majority's example, Merrill Lynch's alleged conduct in connection with the so-called "Nigerian Barges Transaction" — is not actionable under Section 10(b).

With the reasoning that underlies the majority's view set out in this manner, it becomes apparent that any link between the district court's liability ruling and its application of the fraud-on-the-market presumption is tangential at best. The question of whether the banks can be subject to Section 10(b) liability without making public misrepresentations is by no means necessarily related to the applicability of the fraud-on-the-market presumption of reliance. Although it is true that the fraud-on-the-market presumption requires that there be a public misrepresentation upon which the market can rely, in this case, there were certainly public misrepresentations that arose out of the banks' allegedly fraudulent transactions with Enron; the rub, of course — and the banks' primary argument for why they are not subject to Section 10(b) liability — is that Enron, not the banks, conveyed the misrepresentations to the market. According to the banks, because they made no public statements, they are, at worst, aiders and abettors of Enron's fraud. The plaintiffs counter by asserting, among other things, that the banks' allegedly fraudulent conduct is not immunized simply because their joint scheme to defraud affected the market only through Enron's public statements.

The majority's leap to reach and resolve this dispute — which is strictly a question about the substantive reach of Section 10(b) — at the certification stage overlooks a key fact: Regardless of whether this court ultimately agrees with the district court that the banks' alleged actions are "deceptive" acts within the meaning of Section 10(b), those actions affected the market via Enron's public misrepresentations. Thus, this court can determine whether the plaintiffs are entitled to the fraud-on-the-market presumption without delving into the district court's decision that the banks' conduct is covered by Section 10(b). Viewed in this light, there is little doubt that in this case the

25

element of transaction causation, or reliance, can be satisfied by the market's reliance on Enron's public representations of its financial health and/or its statements about the transactions in question. See Simpson v. AOL Time Warner Inc., 452 F.3d 1040, 1052 (9th Cir. 2006) ("[A] plaintiff may be presumed to have relied on th[e] scheme to defraud if a misrepresentation, which necessarily resulted from the scheme and the defendant's conduct therein, was disseminated into an efficient market and was reflected in the market price."); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 509 (S.D.N.Y. 2005) (applying fraud-on-the-market presumption to claims against secondary actors even though only issuer made public misrepresentations to the market). Accordingly, this court can assess whether a classwide presumption of reliance applies in this case without first considering the district court's merits ruling on the scope of Section 10(b) liability. I would therefore find that the latter issue is beyond the permissible scope of our limited, interlocutory review under Rule 23(f).

The majority is, of course, correct in some sense — if the banks engaged in no conduct within the reach of Section 10(b), then the plaintiffs cannot prevail against them in a class action. But the plaintiffs' inability to proceed under such circumstances would have nothing to do with the need to prove reliance on an individual basis. When this court decides, on a common, classwide basis, as the majority does today, that the banks' alleged conduct is non-actionable as a matter of law, it is dubious to then claim that we are actually finding only that individual issues of reliance predominate over common issues. Under the majority's reasoning, individual questions of reliance do not predominate; rather, reliance is simply irrelevant, because no plaintiff can, on an individual or a class basis, establish that the banks engaged in any actionable conduct.

The mere fact that the resolution of a merits issue against a putative class of plaintiffs would, by definition, preclude the maintenance of a class action simply cannot be sufficient to warrant review

of that issue on an interlocutory appeal. Under such a rule, the resolution of any Rule 12(b)(6) issue would then become fair game for Rule 23(f) review. The D.C. Circuit has rejected just such a "but-for" approach to Rule 23(f) appeals. In <u>In re: Lorazepam & Clorazepate Antitrust Litigation</u>, 289 F.3d 98, 107 (D.C. Cir. 2002), the court refused to grant a Rule 23(f) appeal despite the petitioner's assertions that the plaintiff class members lacked antitrust standing to maintain the suit. In a passage that is particularly pertinent to this case, the court explained that Rule 23(f) does not permit review of every issue that, if resolved against the plaintiffs, would destroy the class action:

> Mylan's effort to recast its Rule 12(b)(6) arguments as a challenge to class certification on the ground that a class of direct purchasers lacks antitrust standing, is to no avail. That Mylan's argument as to antitrust standing may dispose of the class as a whole and thereby preclude a lawsuit by direct purchasers goes well beyond the purpose of Rule 23(f) review because it is unrelated to the Rule 23 requirements. The fact that Mylan's challenge would be dispositive of the class action is not unlike a variety of issues of law on the merits of a class action because of the very nature of commonality; review of such issues would expand Rule 23(f) interlocutory review to include review of any question raised in a motion to dismiss that may potentially dispose of a lawsuit as to the class as a whole. This result would inappropriately mix the issue of class certification with the merits of a case, which do not warrant interlocutory review pursuant to Rule 23(f). What matters for purposes of Rule 23(f) is whether the issue is related to class certification itself . . . .

<u>Id.</u> (internal citation omitted).

The relationship between the banks' potential Section 10(b) liability and class certification in this case is no closer than the relationship between antitrust standing and class certification described in <u>Lorazepam</u>. Despite the majority's claims to the contrary, as I explained above, whether the banks' conduct can give rise to a Section 10(b) action under any circumstances need not be decided in order to determine whether the plaintiffs are entitled to invoke <u>Basic</u>'s presumption of reliance, and it is therefore not sufficiently related to any of Rule 23's class action requirements to warrant interlocutory review.

## II.

Even were it appropriate for this court to consider whether the banks' alleged conduct can constitute a primary violation of Section 10(b) and Rule 10b-5, the majority errs by defining the term "deceptive" in Section 10(b) in an unduly restrictive fashion.

Based on language gathered from inapposite Supreme Court decisions, the majority opinion concludes that the Supreme Court has defined "deceptive" in a manner that both departs from the plain meaning of the word and reduces Section 10(b)'s flexible prohibition on "directly or indirectly" using or employing any "deceptive device or contrivance"[7] to a much more circumscribed prohibition that applies only to specific misrepresentations or omissions in breach of an affirmative duty to speak. Having arrived at this narrow definition of deceptive acts, the majority opinion then finds that, because the banks did not make misrepresentations or have a duty to speak, Section 10(b) does not reach their conduct, and imposing liability on them would be indistinguishable from the type of aiding and abetting liability barred by Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994).[8]

Such a narrow interpretation of Section 10(b) is neither compelled nor justified by Supreme Court precedent. The majority's conclusion hinges almost entirely on its determination that a court considering the reach of Section 10(b) cannot give the term "deceptive" (in the phrase "manipulative

---

[7]Section 10(b) also prohibits any "manipulative" device or contrivance, but I do not take issue with the majority opinion's conclusion that the banks' alleged conduct in this case was not "manipulative," as that term is used in Section 10(b). See supra, at ___.

[8]Although this issue is commonly framed as whether liability can be imposed consistent with the Central Bank decision, Central Bank itself establishes relatively little about the reach of Section 10(b). The plaintiffs in that case alleged only that Central Bank aided and abetted a violation of Section 10(b); the plaintiffs did not claim that the bank was liable as a primary violator of the statute. See Central Bank, 511 U.S. at 191 ("Respondents concede that Central Bank did not commit a manipulative or deceptive act within the meaning of § 10(b).").

28

or deceptive device or contrivance") its commonly understood, or dictionary, meaning,[9] because the Supreme Court has told us that a defendant acts deceptively only if it makes a misrepresentation or remains silent in the face of a duty to disclose. The majority opinion relies primarily on Chiarella v. United States, 445 U.S. 222 (1980), and United States v. O'Hagan, 521 U.S. 642 (1997), to support this narrow view of the statutory language. The majority's view is not implausible — some statements in Chiarella, O'Hagan, and other cases can be read together to support the majority's position[10] — but neither is it compelling, and the passages upon which the majority relies fall far short of establishing that the Supreme Court has limited Section 10(b)'s prohibition on "deceptive" practices exclusively to misrepresentations or omissions.

Neither Chiarella nor O'Hagan purported to hold that a person can never engage in "deceptive" action through conduct, rather than speech or nondisclosure. In those cases, the Court held that a person who trades on non-public information violates Section 10(b) only if he breaches a duty to disclose, either to the source of the information or to the other party to the trade. See O'Hagan, 521 U.S. at 654-56; Chiarella, 445 U.S. at 235.[11] Those cases, however, dealt only with insider trading

---

[9]Reference to the common, dictionary definition is, incidentally, the approach that the Supreme Court has used to define the words "manipulative," "device," and "contrivance." See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 & nn.20-21 (1976).

[10]It is unsurprising that the Supreme Court's decisions generally speak of misrepresentations or omissions, as they are typically the means through which fraudulent conduct reaches the market. As Judge Kaplan remarked in Parmalat, "[A]ny deceptive device or practice, other than one involving manipulative trading activity, logically requires that somebody misrepresent or omit something at some point, even though the device could entail more than the misrepresentation." Parmalat, 376 F. Supp. 2d at 497.

[11]Also central to those cases, however, was the Chiarella court's observation that entering into a transaction on the basis of unequal information, while perhaps unfair, is not inherently fraudulent or deceptive in any sense of those words. See Chiarella, 445 U.S. at 232 ("[N]ot every instance of financial unfairness constitutes fraudulent activity under § 10(b)."); id. at 233 ("[N]either the Congress nor the Commission ever has adopted a parity-of-information rule.").

— the defendants in those cases were prosecuted only for their silence, i.e., their failure to disclose that they possessed material information that other investors in the market did not possess. Neither of those cases involved allegations of a multi-party scheme to defraud. Here, by contrast, the plaintiffs assert that the banks engaged in a scheme with Enron whereby they structured and entered into wholly fraudulent transactions that were designed for the sole purpose of falsifying Enron's financial results. Nothing in <u>Chiarella</u> or <u>O'Hagan</u> forecloses the conclusion that Section 10(b) can reach "deceptive" conduct that is not in the form of a misrepresentation or omission in cases, like this one, that involve large-scale schemes to defraud.

Nor do any of the Supreme Court's other decisions establish that fraudulent conduct is beyond the reach of Section 10(b) simply because it affects the market only through the misrepresentations of another participant in the fraudulent scheme. As noted above, <u>Central Bank</u> itself did not reach this question because the plaintiffs in that case asserted only that the defendant's conduct amounted to aiding and abetting. Moreover, language from other of the Court's opinions affirmatively indicates that "deceptive" conduct need not always be in the form of a misrepresentation or an omission. <u>See</u> <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 475-76 (1977) (explaining that the Court's prior cases all "included some element of deception," and did not "support the proposition . . . that a breach of fiduciary duty by majority stockholders, without any <u>deception, misrepresentation, or nondisclosure</u>, violates the statute and the Rule") (emphasis added).

Because the Supreme Court has not, as the majority opinion maintains, narrowly defined the term "deceptive" to capture only direct misrepresentations or omissions, this court must construe the disputed statutory language "not technically and restrictively, but flexibly to effectuate its remedial purposes." <u>SEC v. Zandford</u>, 535 U.S. 813, 819 (2002) (internal quotation marks omitted). In light

30

of this canon of interpretation, I see no basis for the majority opinion's strict, narrow reading, and I agree with the district court, the Ninth Circuit, Judge Kaplan, and the SEC that Section 10(b)'s prohibition on directly or indirectly employing any "deceptive device or contrivance" can reach secondary actors who, with scienter, engage in fraudulent transactions that are used to inflate an issuer's financial results.  See Simpson, 452 F.3d at 1050 ("If a defendant's conduct or role in an illegitimate transaction has the principal purpose and effect of creating a false appearance of fact in the furtherance of a scheme to defraud, then the defendant is using or employing a deceptive device within the meaning of § 10(b)."); Enron, 2006 U.S. Dist. LEXIS 43146, at *167-74 (adopting SEC view "that a deceptive act includes a transaction whose principal purpose and effect is to create a false appearance of revenues, which can be accomplished by acts as well as by words") (internal quotation marks omitted); Parmalat, 376 F. Supp. 2d at 502-03.[12]

### III.

The investment banks also assert that the district court erred by failing to apply this court's decision in Greenberg v. Crossroad Systems, Inc., 364 F.3d 657 (5th Cir. 2004), to determine whether the plaintiffs could proceed under the fraud-on-the-market theory.  In Greenberg, a panel of this court held that plaintiffs who seek to invoke the fraud-on-the-market presumption of reliance must show both that the misrepresentations made to the market were "non-confirmatory," i.e., that they did not simply confirm the market's expectations, and that the misrepresentations actually

---

[12]Although those courts that have found that Section 10(b) can reach conduct of the type alleged here have developed different formulations of the standard for liability, see Simpson, 452 F.3d at 1048 & n.5, I agree with the majority that any such distinctions are not relevant to this interlocutory appeal.  See supra, at ___ n.25.

31

affected the market price of the securities in question.  See id. at 665-66.[13]

In its June 5, 2006 opinion, the district court declined to apply Greenberg to this case.  The district court concluded that Greenberg applies only to cases under Rule 10b-5(b) involving misrepresentations, not to cases like this one involving a scheme to defraud under Rule 10b-5(a) or (c).  See Enron, 2006 U.S. Dist. LEXIS 43146, at *287-88.  On appeal, the plaintiffs proffer several additional reasons why Greenberg does not mandate reversal.  Plaintiffs assert that (1) Greenberg does not apply to cases like this one, where the alleged scheme to defraud stems from the defendants' fraudulent efforts to conceal from the market information that would show that the issuer is not actually meeting the market's expectations; (2) Greenberg should not be read to saddle plaintiffs with the burden of showing that the alleged misrepresentations actually changed the market price of the issuer's securities; and (3) Greenberg's requirements have, in any event, been satisfied in this case.

I agree with the plaintiffs that this court cannot use Greenberg to relieve the defendants of the burden, allocated to them in Basic and in subsequent decisions of this court, of rebutting the fraud-on-the-market presumption.  In Basic itself, the Supreme Court was unmistakably clear that the defendant has the burden of rebutting the presumption of reliance:

> Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance. For example, if [defendants] could show that the "market makers" were privy to the truth about the merger discussions here with Combustion, and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone.

[13]This required showing is in addition to Basic's requirements that plaintiffs show that (1) there were material, public misrepresentations; (2) the securities in question traded in an efficient market; and (3) the plaintiffs traded in the securities in question between the date of the misrepresentations and the date on which the truth was disclosed to the market.  See Greenberg, 364 F.3d at 661.

Basic, 485 U.S. at 248; see also id. at 245 ("Arising out of considerations of fairness, public policy, and probability, as well as judicial economy, presumptions are also useful devices for allocating the burdens of proof between parties."). The clear import of Basic was not lost on this court. In Fine v. American Solar King Corp., 919 F.2d 290, 299 (5th Cir. 1990), this court recognized that the defendant could rebut Basic's presumption of reliance only by showing: "(1) that the nondisclosures did not affect the market price, or (2) that the Plaintiffs would have purchased the stock at the same price had they known the information that was not disclosed; or (3) that the Plaintiffs actually knew the information that was not disclosed to the market."

This court's more recent decisions, including Greenberg, have at least professed fidelity to Basic's burden-shifting approach. In Greenberg, the court described the fraud-on-the-market presumption as follows:

> Under this theory, reliance on the statement is rebuttably presumed if the plaintiffs can show that (1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed. The Defendants may rebut this presumption by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at fair market price[.]"

Greenberg, 364 F.3d at 661-62 (quoting Basic, 485 U.S. at 247) (alterations in original) (internal citations and footnote omitted). In parts IV and V of its opinion, however, the Greenberg panel changed course and found that it is actually the plaintiffs' affirmative burden to show, as a prerequisite to the application of the presumption, that the defendant's misrepresentation actually moved the market price of the security in question:

> We are satisfied that plaintiffs cannot trigger the presumption of reliance by simply offering evidence of any decrease in price following the release of negative information. Such evidence does not raise an inference that the stock's price was actually affected by an earlier release of positive information. To raise an inference

33

through a decline in stock price that an earlier false, positive statement actually affected a stock's price, the plaintiffs must show that the false statement causing the increase was related to the statement causing the decrease.

Id. at 665; see also id. at 663 (referring to the plaintiffs' "burden in a fraud-on-the-market case to show that a stock's price was actually affected by an allegedly false statement").

Greenberg appears to have mistakenly relied on this court's earlier decision in Nathenson v. Zonagen Inc., 267 F.3d 400 (5th Cir. 2001), as the authority for its decision to relieve securities defendants of the burden of rebutting the fraud-on-the-market presumption. In Nathenson, a panel of this court held that "where the facts properly considered by the district court reflect that the information in question did not affect the price of the stock then the district court may properly deny fraud-on-the-market based recovery." Nathenson, 267 F.3d at 415. Nathenson did not, however, expressly purport to convert the defendant's burden of rebutting the fraud-on-the-market presumption — by, for example, showing that the alleged misrepresentation had no effect on the market price of the security — into a burden on the plaintiff to show that the misrepresentation did affect the price of the security. Rather, the panel in Nathenson simply determined that a district court did not err when it found that the allegations of the plaintiffs' complaint affirmatively demonstrated that the misrepresentations in question did not affect the price of the issuer's stock. Id. at 414, 417-18. In other words, the plaintiffs in Nathenson affirmatively pleaded themselves out of the fraud-on-the-market presumption. Thus, Nathenson lends no support to the view that securities plaintiffs can invoke the fraud-on-the-market presumption only if they first affirmatively demonstrate that the market moved in response to the alleged misrepresentation.

Because the Greenberg panel's decision to reallocate the burdens in fraud-on-the-market cases conflicts not only with Basic, but also with earlier decisions of this court, such as Fine, I would follow

34

those decisions and hold that the defendant retains the burden of rebutting <u>Basic</u>'s presumption of reliance. <u>See, e.g.</u>, <u>Modica v. Taylor</u>, 465 F.3d 174, 183 (5th Cir. 2006) ("'When panel opinions appear to conflict, we are bound to follow the earlier opinion.'") (quoting <u>H&D Tire & Auto.-Hardware, Inc. v. Pitney Bowes Inc.</u>, 227 F.3d 326, 330 (5th Cir. 2001)); <u>cf. Unger</u>, 401 F.3d at 322 n.4 ("[I]t is the Supreme Court's job to overrule <u>Basic</u>, in the absence of outright conflict with the Private Securities Litigation Reform Act.") (citation omitted). The banks do not appear to have satisfied that burden on the record before us.[14]

## IV.

The banks argue that the district court erroneously determined that any defendant found to have knowingly violated the securities laws could be held jointly and severally liable for all of the losses

---

[14]<u>Greenberg</u> also purports to require that the plaintiffs establish that the defendant's false statement was "non-confirmatory" — <u>i.e.</u>, that it did not simply confirm the market's preexisting expectations about, for example, the size of the issuer's quarterly earnings — before the fraud-on-the-market presumption can apply. <u>See</u> <u>Greenberg</u>, 364 F.3d at 665-66. According to the <u>Greenberg</u> panel, the market cannot rely on allegedly false "confirmatory" statements because "confirmatory information has already been digested by the market and will not cause a change in the stock price." <u>Id.</u>; <u>see also</u> <u>id.</u> at 666 ("Because the presumption of reliance is based upon <u>actual movement</u> of the stock price, confirmatory information cannot be the basis for a fraud-on-the-market claim.").

This requirement from <u>Greenberg</u> appears to be based on a misinterpretation of this court's earlier decision in <u>Nathenson</u>. The <u>Nathenson</u> panel stated that, in certain "special circumstances," such as when an issuer provides false information that confirms the market's expectations, the market <u>can</u> rely on those false statements, even though the market price may not change at the time of the false "confirmatory" statement. <u>See</u> <u>Nathenson</u>, 267 F.3d at 319. Rather, the statement's effect on the market price will show only when the falsity of the statement is later disclosed and the market price declines. <u>See</u> <u>id.</u>

This makes sense: if the market expects earnings of $1.00 per share, then the share price might not move in response to a false public statement confirming that the issuer earned $1.00 per share (even though the issuer in fact <u>lost</u> $.50 per share). The lack of movement does not, however, mean that the false statement had no actual effect on the share price. Had the issuer truthfully disclosed its loss of $.50 per share to a market that expected earnings of $1.00 per share, the share price would have declined, rather than remaining steady; the false "confirmatory" statement actually affected the share price by keeping it artificially high in a situation where a truthful statement would have caused the share price to decline. As the <u>Nathenson</u> court suggested, the effect that the false statement had on the share price in such a case can be shown when the falsity of the statement is disclosed and the share price declines. <u>See</u> <u>id.</u>

Thus, there appears to be no basis in <u>Nathenson</u> or otherwise for <u>Greenberg</u>'s conclusion that false "confirmatory" statements can never support a claim proceeding under a fraud-on-the-market theory.

35

caused by Enron's entire overarching fraudulent scheme. The banks assert that without this erroneous legal conclusion, the district court could not have found that the proposed class satisfied Rule 23(b)(3)'s predominance requirement or the manageability aspect of Rule 23(b)(3)'s superiority requirement.[15]

Before the enactment of the PSLRA, the general rule in Section 10(b) actions was that defendants found to have violated Section 10(b) or Rule 10b-5 were jointly and severally liable for all of the plaintiff's damages. See, e.g., Musik, Peeler & Garrett v. Employers Ins. of Wausau, 508 U.S. 286, 292 (1993) (noting that violators "share joint liability for that wrong under a remedial scheme established by the federal courts"); TBG, Inc. v. Bendis, 36 F.3d 916, 927 (10th Cir. 1994); G.A. Thompson & Co. v. Partridge, 636 F.2d 945, 963 (5th Cir. 1981); Ross v. Licht, 263 F. Supp. 395, 411 (S.D.N.Y. 1967).[16] The legislative history of the PSLRA suggests that Congress was concerned about the unfairness that could result from the application of the traditional joint and several liability rule in many cases. See H.R. Rep. No. 104-369, at 37 (1995) (Conf. Rep.), 1995 U.S.C.C.A.N. 730, 736 ("Under current law, a single defendant who has been found to be 1% liable may be forced to

---

[15]Among the factors to be considered in determining whether Rule 23(b)(3)'s superiority requirement is satisfied are "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b)(3).

[16]See also Amy J. St. Eve & Bryce C. Pilz, The Fault Allocation Provisions of the Private Securities Litigation Reform Act of 1995 — A Roadmap for Litigants and Courts, 3 N.Y.U. J.L. & Bus. 187, 194 (2006) (stating that prior to the PSLRA, "[c]ourts recognized an implied theory of joint and several liability in Section 10(b) and Rule 10b-5 claims"); Marc I. Steinberg & Christopher D. Olive, Contribution and Proportionate Liability Under the Federal Securities Laws in Multidefendant Securities Litigation After the Private Securities Litigation Reform Act of 1995, 50 SMU L. Rev. 337, 339-40 (1996) ("[I]f co-defendants were adjudged liable in a federal securities action, plaintiffs were entitled to recover the total judgment from any of the subject defendants."); Stuart M. Grant et al., The Devil Is in the Details: Application of the PSLRA's Proportionate Liability Provisions Is so Fraught With Uncertainty that They May Be Void for Vagueness, 1505 PLI/Corp. 83, 85 (2005) ("[Until 1995], each defendant found to have violated the federal securities laws could be required to pay the full amount of any judgment to the plaintiff, regardless of whether that defendant was the primary violator or merely one of many violators.").

pay 100% of the damages in the case."); S. Rep. No. 104-98, at 20 (1995), 1995 U.S.C.C.A.N. 679, 699 ("Under joint and several liability, each defendant is liable for all of the damages awarded to the plaintiff. Thus, a defendant found responsible for only 1% of the harm could be required to pay 100% of the damages."). To combat this perceived unfairness, as part of the PSLRA, Congress enacted 15 U.S.C. § 78u-4(f), which replaced the existing joint and several liability regime with one of proportionate liability and limited joint and several liability to defendants who knowingly violate the securities laws. 15 U.S.C. § 78u-4(f)(2)(A) provides that any defendant "against whom a final judgment is entered in a private action shall be liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws." If no knowing violation is found, the statute provides that the defendant "shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that [defendant]." Id. § 78u-4(f)(2)(B).

The banks assert that, under these statutory provisions, a defendant who knowingly violates Section 10(b) can be jointly and severally liable only for the damages caused by conduct in which that defendant knowingly participated. Anything more, the banks argue, would run afoul of the PSLRA's requirement that the plaintiff must "prov[e] that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages," id. § 78u-4(b)(4), and would be tantamount to imposing liability for conspiracy to violate Section 10(b). See Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 841 (2d Cir. 1998) (stating that, post-Central Bank, there is no cause of action for conspiracy to violate Section 10(b)). As the banks would have it, then, even if they were found to have knowingly violated Section 10(b), they could be held jointly and severally liable for only those damages that the plaintiffs suffered specifically as

37

a result of the transactions in which the banks participated with Enron. The plaintiffs, on the other hand, assert that because the alleged conduct of the banks, Enron, and others was all part of a single fraudulent scheme, any knowing violator can be held jointly and severally liable for harm caused by the other scheme participants.

In considering whether the proposed class satisfied the requirements of Rule 23(b)(3), the district court rejected the banks' argument and determined that the PSLRA permits courts to broadly impose on knowing violators joint and several liability for all of the damages caused by a fraudulent scheme as a whole:

> The Court finds that a reasonable argument can be made that <u>where a defendant knowingly engaged in a primary violation of the federal securities law that was in furtherance of a larger scheme, it should be jointly and severally liable for the loss caused by the entire overarching scheme, including conduct of other scheme participants about which it knew nothing</u>. Indeed, express joint and several liability in the statute is a meaningless concept if it is limited to a defendant's own wrongdoing. This Court acknowledges that it has previously questioned whether liability for conduct caused by all the scheme participants is compatible with the "knowing" requirement under § 78u-4(f)(2)(A). Nevertheless, the Court observes that the PSLRA not only replaced joint and several liability with proportionate liability except when the conduct was "knowing", but established a right to contribution under § 78u-4(f)(8) to provide a remedy for unfairness, and, with a similar result, the judgment reduction formula embodied in § 78u-4(f)(2)(A) [sic]. Accordingly this Court concludes that Lead Plaintiff may pursue its claims for joint and several liability against those Defendants found to be primary violators in the scheme, as a whole.

<u>Enron</u>, 2006 U.S. Dist. LEXIS 43146, at *222-23 (emphasis added) (internal citation omitted).[17]

The text of the PSLRA's joint and several liability provision does not, on its own, resolve this issue. Section 78u-4(f)(2)(A) does not purport to define the <u>scope</u> of joint and several liability; rather, that provision simply places limits on <u>who</u> can be subject to joint and several liability. The

---

[17]The district court also correctly noted that there is a paucity of authority addressing this issue. <u>See</u> <u>Enron</u>, 2006 U.S. Dist. LEXIS 43146, at *222.

statute's legislative history, however, indicates that Congress intended that the potential scope of joint and several liability would remain the same as it was under the pre-PSLRA law. See H.R. Rep. No. 104-369, at 38, 1995 U.S.C.C.A.N. at 737 ("The Conference Report imposes full joint and several liability, as under current law, on defendants who engage in knowing violations of the securities laws."); S. Rep. No. 104-98, at 22, 1995 U.S.C.C.A.N. at 701 (same).

Under the pre-PSLRA practice described above, any defendant found to have violated Section 10(b) or Rule 10b-5 was jointly and severally liable for all of the damages suffered by the plaintiff; no distinction was made based on what portion of the plaintiff's damages were caused by, or traceable to, any specific defendant's conduct. See TBG, Inc., 36 F.3d at 927 ("Liability in Rule 10b-5 cases is strictly joint and several and is never allocated among individual defendants in deciding the plaintiff's claim."); Ross, 263 F. Supp. at 411 (finding joint and several liability for Section 10(b) claim because "the participation of each defendant was essential to the success of the scheme and there is no way to apportion guilt"); see also 5 Alan R. Bromberg & Lewis D. Lowenfels, Bromberg & Lowenfels on Securities Fraud and Commodities Fraud § 8.48 (2d ed.) ("[A]ny person found to have any liability whatsoever, no matter how insignificant, could be liable to plaintiffs for the total damages caused by all the misconduct."). Accordingly, there appears to be no support for the banks' assertion that any joint and several liability must be limited to joint and several liability for only the damages caused directly by the specific transactions in which they participated with Enron. Therefore, if the plaintiffs could succeed in proving at trial that the conduct alleged amounted to a single, overarching fraudulent scheme (as opposed to, as the banks assert, a number of separate and distinct fraudulent schemes), they should be permitted to recover damages jointly and severally from any knowing violator, and the scope of that joint and several liability should not be limited to the

damages caused directly by that defendant's participation in the scheme.[18]

The banks are correct, however, that the scope of joint and several liability for a knowing violation of Section 10(b) must be informed by the reach of Section 10(b) itself. In particular, it seems fundamental that a defendant cannot be jointly and severally liable to a plaintiff unless that defendant is, in fact, primarily liable to that plaintiff. In other words, assuming that a jury finds that the banks knowingly violated Section 10(b) through their alleged participation with Enron in a scheme to defraud Enron's investors, they can be held jointly and severally liable for <u>all</u> of the scheme-related losses suffered by any investor who was harmed in some way by their conduct, but the banks cannot be held responsible for the losses of any investors to whom they are not primarily liable under Section 10(b).

In a multi-defendant securities class action such as this one, where presumably thousands of investors were harmed by a number of different acts committed by different defendants over a period of several years, not every plaintiff will have been harmed by every defendant. For example, if a particular defendant, who was previously uninvolved with the scheme, first structured or participated in a fraudulent transaction to falsely inflate Enron's financial results near the end of the class period, that defendant could not be held liable under Section 10(b) to any investors who purchased Enron stock (the price of which may have already been inflated by the fraudulent acts of other defendants) <u>before</u> that transaction. Since those investors purchased their stock before the defendant engaged in any fraudulent conduct, they could not state a Section 10(b) claim against it, because they would

---

[18]This court does not need to decide whether any defendant could be jointly and severally liable for damages caused by the actions of others if the plaintiffs could not prove that all of the conduct they allege was part of a single fraudulent scheme. In their brief, the plaintiffs concede that a defendant can be jointly and severally liable only for the damages caused by a scheme in which it participates.

40

be unable to show either that the defendant's conduct caused them to purchase Enron stock at an inflated price (the element of reliance, or transaction causation) or that it caused them any harm (the element of loss causation). To make the defendant jointly and severally liable for the damages of those investors would, therefore, effectively expand the defendant's underlying Section 10(b) liability to encompass plaintiffs who could not otherwise state a claim against it.[19] It would simply be inconsistent with the elements of a Section 10(b) claim to hold a knowing violator jointly and severally liable for the damages of any plaintiff to whom it is not primarily liable under Section 10(b).[20]

That the fraud in this case is alleged to have been the result of a single, overarching scheme to defraud does not alter this conclusion. After Central Bank, a defendant can be liable under Section 10(b) only if it commits a primary violation of the statute. See Central Bank, 511 U.S. at 191. Under the district court's open-ended interpretation of the PSLRA's joint and several liability provision, however, a defendant's knowing violation of the securities laws could not only increase the damages for which it can be liable, but could also make that defendant responsible for the damages of plaintiffs who were harmed exclusively by the conduct of others, and to whom that defendant could not otherwise be liable at all. This, in my view, exceeds the permissible bounds of primary liability under Section 10(b) and amounts to the impermissible imposition of conspiracy liability. See Dinsmore, 135 F.3d at 841.

Because the district court's class certification decision was based, in part, on this legal error, I

---

[19]The plaintiffs expressly concede this point in their briefs, as they state that no defendant can be liable for damages from before the date on which it violated Section 10(b).

[20]In the example given, if the defendant knowingly violated Section 10(b), it could be jointly and severally liable to any investors who purchased Enron stock after its fraudulent conduct and before the disclosure of the truth, even if those investors were also harmed by the conduct of other participants in the scheme.

would reverse the decision to certify the class on this ground only and remand the case to the district court to consider whether, in light of the proper interpretation of the PSLRA's joint and several liability provision, the proposed class still satisfies the predominance and superiority requirements of Rule 23(b)(3).

## CONCLUSION

Consequently, I concur in the judgment reversing the district court's certification order, but I do so only for the reasons assigned herein. I would remand the case to that court for additional consideration of whether, in light of this opinion, this case meets Rule 23's requirements for class certification.